Thank you. And with the court's permission, I'd like to reserve five minutes for rebuttal. I'll try to help you, but keep an eye on the clock, if you will, please. Certainly. Good afternoon. May it please the court. Errors remaining on behalf of the defendants. Your honors, the district court in this case issued two sweeping class-wide permanent injunctions on behalf of a single-name plaintiff who lacked standing to seek such relief and had no colorable Fourth Amendment claim to speak of. Based on evidence that did not support the That relief causes severe and irreparable harm to the government's ability to enforce the immigration laws and should be reversed. As a cross appeal, the district court correctly held that the plaintiffs lack any entitlement to review of the executive branch's probable cause of terminations. And I'll speak to that after the first two injunctions. So from the government's perspective, there are at least two threshold reasons why nothing that happened after 2014 in this case should ever have happened. The sole-name plaintiff, Mr. Gonzalez, lacked Article III standing, and the sole-name plaintiff, Mr. Gonzalez, had no plausible Fourth Amendment claim, starting first with Article III standing. I didn't see a response to this in Plaintiff's Brief, but first and foremost, Mr. Gonzalez conceded below, at paragraphs 65 and 67 of the operative Third Amendment complaint, that he made the conscious decision to remain in Los Angeles County custody, because he believed that if he posted a bond with the aid of a bail bondsman, he would have then passed to ICE custody. And as this court in Mendia in 2014 held, that when you make the decision to remain in custody to avoid the natural consequence of your posting bond or your release from custody, that's not cognizable injury at all. So from the get-go, Mr. Gonzalez has no standing. Putting that to the side for a minute, the real grievance the government has here, though, is the lower courts granting six years after the first judge in the case found there was no standing for any prospective relief at all, injunctive or otherwise, that six years later, the second judge in the case, because the first judge unfortunately passed away during proceedings sometime before, nevertheless found, without actually addressing the prior court's decision, that there was standing for prospective injunctive relief. You're saying that Judge O'Connell found no standing? Yes, Your Honor. Okay. Yeah, Judge O'Connell found no standing under lines in this court's cases that we also cite in our brief, cases like Hodger's and Mayfield. No standing for any sort of prospective relief for Mr. Gonzalez. Now, the second judge, Judge Barreaux, did not acknowledge that decision, did not address that decision, did nothing with that decision, although that decision was drawn to his attention during the post-trial briefing on the issue, because all of a sudden, we were discussing injunctive relief again, when six years prior, the court had dismissed that. And I think this is important. I mean, plaintiffs made certain litigation choices that they should not be able to walk away from here. In 2014, the district judge, the first judge, after four bites of the apple, four different versions of the complaint, said to plaintiffs, enough, I'll give you one last chance, give me some facts or give me a new plaintiff that will allow me to find it on a very generous standard to you that you have standing to seek this sort of relief. And if you don't, I'll dismiss those claims for relief with prejudice. And plaintiffs informed the court in a filing on the record, they do not intend to amend the complaint and they wish to proceed. So, I don't, from the government's perspective, six years later, for this to be resurrected in the way that a district court resurrected these claims for injunctive relief as to both injunctions, just, it's clear error. Are you suggesting that Judge O'Connell's ruling was somehow on this issue that could not be revisited without some entirely new facts? Well, not quite, Your Honor. We've suggested in our briefing that it was law of the case. At a bare minimum, under this court's precedence on that area dealing with issues like standing or jurisdiction, the court had to have acknowledged the prior decision. And then, actually, it looks like based on the facts that I got at trial or at summary judgment or something in the six years in between the last decision and the present, that there's a basis for me to revisit this issue. That never happened. There's nothing in the record, there's nothing in the findings of fact, and there's nothing in the judgment about that at all. And even without that, a last point on standing, and this, I think, is an important point that plaintiffs don't respond to. Even if Mr. Gonzalez did have standing, which, for the reasons we say, he doesn't, there's a second part of this. There's underlines there needs to be a showing for an entitlement to an injunction in equity. That means, regardless of standing, and as this court has said in other cases, these two inquiries sort of blend together. But if there's no showing as to a likelihood of future harm that this is going to happen to this named plaintiff again, that is that they're going to commit another crime, end up in local custody, come to ICE's attention, and then end up with another detainer, then there's no basis for equitable relief, prospective equitable relief. And the district court, in its findings of fact and conclusions of law, made no findings on equity either. There's a single sentence in which the district court says, well, detainers cost fourth amendment violations, period, full stop. That's it. That's page 36. Just as a matter of law, putting aside for a moment whether the facts match it, in Mendia versus Garcia, didn't we say that injury reasonably incurred to avoid future harm also constitutes an injury? No, Your Honor. I don't think that's right. I think there were two separate holdings in Mendia. There was the first holding as to detention that was caused when no bail bondsman was willing to postpone on behalf of plaintiff. And we don't have those facts here. Here we have plaintiff conceding that he chose not to postpone and had, through the assistance of a bail bondsman that his sister had been speaking with, was willing to postpone. The other holding in Mendia was if you choose to stay in custody when you're free to go or your actions can make you free to go, there's no injury for that. So there were two different holdings there. And I don't think the bail bondsman fact pertains here. On the fourth amendment threshold issue, this is the second just threshold flaw in everything that happened after 2014 in this case. No matter what operative complaint you look at, Gonzalez was never seized because of an ICE detainer. And that's the test. You have to actually show that you were seized because of an ICE detainer. And that's just not in the record here. And again, the choice, Mr. Gonzalez made the choice and Cici made the choice to remain in custody. But Mr. Riveni, I'm sorry if I'm mispronouncing that. That's right, Your Honor. So I understand your point with respect to Riveni and whether Mr. Gonzalez chose to remain in custody when he could have been released on a bond. But what about the existence of the detainer at the time that the suit was filed? Now, I understand it was released when ICE learned that he was an ICE citizen. But at the time he filed the original complaint, assuming that we're looking at jurisdiction as of the time of the threat of detention because of the detainer? I think you've gone back to standing, Your Honor. And he would have standing to seek relief as to that particular ongoing injury. And I'd point the court to Mayfield. Putting aside the Mendea issue, because Mendea I think takes care of everything. But assuming there's no Mendea, in Mayfield, this court explained that just because you have an ongoing injury doesn't mean you have standing for prospective relief. And this is what the district court did in this case. She said, okay, you have two court requests for relief. Relief for your ongoing injury, the detainer you have at the time you joined this lawsuit that you are subject to. And this, again, is just standing. And prospective relief. And she said no prospective relief. She didn't address them in Dea Point. I think the case had just come out at the time she was issuing this decision. But the argument I'm making now, Your Honor, is on the merits. Just because Mr. Gonzalez had a detainer that was issued with his name on it to Los Angeles County at the time he joined the suit doesn't mean he was ever seized because of it. And there are two reasons for that. Again, one, the choice not to postpone means if that was the seizure, it's not because of ICE. And second, the detainer was lifted by ICE almost immediately after the lawsuit was begun, such that once that detainer was lifted, if he's remaining in custody, it's because of his state charges. Once his state charges lapsed, he was free to go. But that's not a Fourth Amendment seizure that can be attributed to ICE. Moving on from that, I just want to talk briefly about the state authority injunction. This is the injunction that the state panel stayed and we would suggest to the court to do the same and just reverse that injunction in full. Plaintiffs don't spend a lot of time in their briefs on it. I think it's pretty clear, both under the Supreme Court's decision in Virginia v. Moore and this court's decision in Medina in 2011, state law does not matter for purposes of whether a Fourth Amendment violation has occurred. So even if the issuance of a detainer without more, which we contend is not a seizure, can be a seizure, whether it violates state law is irrelevant. And what the district court said was essentially if there's no state law that authorizes a local law enforcement officer to make a new detention based on the detainer, that's a Fourth Amendment violation for ICE to even issue the detainer in the first place. Medina says no, Virginia v. Moore says no. And I'm not aware of any authority, plaintiffs haven't pointed to any from this circuit or from the Supreme Court saying, well, actually state law changes the calculus. So you could have a different type of seizure in Washington state or Oregon state or California. That's just not how that works. So that was just wrong on its face. And just the database injunction, I think we have both a legal argument and a factual argument as we lay out in our papers. The legal argument is essentially that, well, two legal arguments. First, this class should never have been certified with Mr. Gonzalez as its lead plaintiff. The assumptions that the court, the district court made to get there are essentially, let's assume that the databases ICE relies on circa, I believe it was 2016 when she certified the class, when the court certified the class. Let's assume they're categorically unreliable. And as such, we can then assume that every seizure that occurs based on a detainer relying on those databases is unreasonable. And so there's no need to get into case by case analysis of each individual detainer or each individual arrest based on that detainer. And we think that threshold assumption was just wrong. It's a classic core tenant of Fourth Amendment jurisprudence that an arrest has to be determined based on its facts in the particular circumstances. And I think even if we assume that ICE databases are categorically unreliable, which they aren't, and we'll get to that in a minute, that doesn't get you all the way there because there's two things. There's the ICE detainer that's issued based on, at the time the trial went forward, on a search of 30 different databases after four different individuals at ICE, an analyst, a deportation officer, a supervisor, all take a look at anew via the facts that are presented to them before they issue the detainer. But then there's also what the person or entity making the arrest does. So that's a fifth layer of variability. And I think Gonzalez's facts really highlight the problem of him as the plaintiff here. Mr. Gonzalez was issued a detainer in 2013 because the Los Angeles County Police Department noted in their records that he was born in Mexico. And that then of course went to ICE through the state to federal database information transfer. ICE looked at that and based on that, they issued a detainer. So the question for Mr. Gonzalez isn't whether the database was unreliable. The question for Mr. Gonzalez is, did ICE reasonably rely on Los Angeles County's case of mistaken identity as to where he was born? And as this court has held repeatedly, but recently in the Weinstein case we cite in our brief from 2009, it's not unreasonable to rely on a mistake that another law enforcement agency makes. And so right there we have the plaintiff. His claims aren't common to the class for that reason. And his claims aren't typical of the class for that reason. A couple other reasons why Mr. Gonzalez just doesn't work as a class representative. He's a citizen. Most of the class are non-citizens. He's not subject, as we argue in our brief, to 8 U.S.C. 1252 B-9, whereas any individual non-citizen who is in removal proceedings is and may have to raise their claims there. And last, a point that I don't think the district court addressed in Gonzalez, but acknowledged in the companion case, DeRoy, about half the states in the Ninth Circuit alone have statutes at this point which explicitly bar local law enforcement from ever seizing someone on an ICE detainer. Some of the states don't have any laws. There are only three states that I'm aware of that actually have affirmative, you must cooperate with detainer statutes. So you have a patchwork of different state laws that control whether someone will ever be seized or not. Mr. Gonzalez is in California, and obviously since 2014, no one in California can detain someone based on a detainer. I see I'm getting close to my time, so I just want to talk briefly about the database, the factual injunction. I think the core argument for us that the court just applied the wrong legal test to the wrong set of facts. The court needed to find if there was routine or widespread mistakes that were made and wrongful arrests that were The key fact for us is that on the data presented using discovery and then analyzed by plaintiffs themselves, there's an error rate of under 0.5 percent just in 2015 to 2016 as to individuals who are citizens and those detainers ended up not being being lifted is the word. There was testimony that now with 30 databases that ICE accesses instead of before that were at issue in 2015, that that error rate would be even lower. 0.5 percent is not anywhere close to routine and spread or a large percentage. Those are the buzzwords that the cases use. I'm just talking across appeal. I see I'm over my time, so I'm happy to judge Smith. We can't hear you. You'd say, Why? Why? Why did you? Why do you say that 25 percent error rate doesn't matter? No, no, your honor. 0.5. 0.5. 0.5 percent. You said 25 percent. No, your honor. Oh, the government really got aggressive here. Okay, never mind. I mean, plaintiffs do point to two out of 30 databases that have error rates in the 30 and 42 percent rate. Our position is simply that you take those two, you combine them with the other 28, and that goes down significantly. But also the point is the key mistake that the court was concerned with is are we misidentifying citizens? And that error rate on plaintiff's own data from 2015 to 2016 or their analysis of that data, I should say, is 0.5 percent. And again, that's the four databases that this lawsuit was challenging initially that ICE was actually working with in 2015. As we point out in our brief starting 2018, that went up to 30 databases. So the court enjoined with such a low error rate, a set of databases that were not really even the subject of the data that shows a 0.5 percent, less than 0.5 percent error rate. Just real quickly on the cross-appeal, I think this one's an easy one. It follows from Abel, the 1960 Supreme Court case, and a number of other cases, including this court in Sherman. Immigration is just, it has been since 1798. As the Supreme Court said in Abel, it's different. And there has never been a requirement that an executive determination of probable cause as to removability, be it a detainer or a warrant, has to be reviewed within 48 hours as plaintiffs contend under the same criminal law standards by a neutral third party who is not someone else within the executive branch. I just quickly point the court to two cases that we think are helpful, Chihadah and Arias, one from the First Circuit and one from the Seventh that are both cited in our briefs. Both of them say, so long as someone within ICE has the, or then the INS, now ICE, has the authority to order someone released, there's no problem. All they're entitled to under the statute, individual subject to detainers, is what the statute and the regulations provide. And here that includes within 48 hours of arrest by ICE, presentment to another ICE officer who did not make the arrest to determine whether they should be detained and the removal proceeding should continue. And of course, they may then appeal that. They may go before an immigration judge and they get bond set and they may appeal that to the board. I'd like to keep a couple minutes for my rebuttal, so I will see, I will stop. You can reserve that. Thank you. All right, now we've got two people that are going to appear on behalf of the class, if you will. Who's going first there? Are you doing it okay, very well? You need to turn off your, or turn on your microphone. Okay, and you, how long will your, excuse me, how long will your co-counsel need? I will, I'll be using 12 minutes to address the database claim and the procedural issues, and my colleague will use eight minutes and would like to reserve three minutes of rebuttal for the neutral review claim and the state authority. Okay, well that's, I can say, you've got, excuse me, you've got 20 minutes. You're going to have 12 and she got eight, that's all there is. So just want, I want you to be sure you understand that what almost always happens in this situation is you don't, you get stretched out into somebody else's time. So do your best, we'll try to help you, but you've got 20 minutes altogether between the two of you. Thank you, your honor. May it please the court, Jenny Pasquarello for the plaintiffs, and again with the court's indulgence, I'll address the database claim and the related procedural issues, and my colleague will address the neutral review and state authority claims. At issue in this appeal is ICE's practice of conducting dragnet arrests from computer terminals in an Orange County office building based on nothing but database checks. These agents conduct no other investigation, they consult no other source of information, they rely exclusively on databases that are so materially incomplete and error-ridden that millions of Americans and lawfully present people appear removable when they are not. Thousands of people are subjected to extended detention based on... Counsel, let me, let me ask you this. I, as a general principle, I understand exactly what you're saying, but for example, the police regularly, when they stop you in your car, they, they check your license. They want to see if you've got any outstanding warrants, they want to see if you have other things they can check on. You don't have an objection to that, do you? No, we don't object to the use of databases, nor do we object to ICE using databases, but we do object to them relying exclusively on databases that are proven to be extremely incomplete and error-ridden. Okay, now, would you agree that most of the databases used by the CHP are also flawed, based on the many, many, many cases to that effect? I don't have any information about... Okay, well, let's just say arguendo. Let's just say arguendo that I think a minute ago your, your colleague talked about 5.5. Let's just say that the, that the databases for police is that much wrong. Would that mean that we should not allow the police to consult databases when they stop somebody to see if they've, their, their warrants out for their arrest or something like that? Well, there's two issues to separate here. One is, when you're using databases as the exclusive basis of probable cause, that requires a sufficient reliability of those sources. The second question is, what is, what constitutes reliability? And the evidence here is not 0.5%. The evidence is that the databases are so incomplete that 100% of the time they are wrong about most categories, all the categories of foreign-born U.S. citizens. The only category of foreign-born U.S. citizens that are in the database is 2005. So for everyone else, they appear as non-citizens who are removable. The other evidence that we presented showed other significant errors, such as the visa overstay database that ICE consults is erroneous 42% of the time. But you layer the incomplete nature of these databases with the other layers of error that the district court found, and you're left with a system that is wholly unreliable because you don't know whether the information that you're looking at is accurate and complete and whether the information even pertains to the person that you have before you. But Ms. Pasquarelli, your opposing counsel stated in his argument that ICE now looks at 30 or so databases and cross-checks the information through multiple sources. Did the district court here come up with an error rate based on that system of looking at multiple databases rather than individually looking at, I think it was four databases, where the court found there were errors? Yeah, so let me explain this. First, there's no evidence that there are 30 databases. There were never, there was never any evidence of 30 databases presented to the district court. There was at most evidence about 18 databases, and every single one of those databases is described in the court's opinion. But what is important to understand... There's a difference between being described and being described as having significant errors. I only found, I think, a discussion of four databases as having error. So if it's 18, 18 is still a pretty significant number of databases to cross-reference. Did the district court come up with an error rate for the 18 databases when used together? It did because it looked at what is the information in each of the databases, so what is the system, what is the information presented by the entire system, the entirety of the 18 databases, and does it provide reliable information that you need to make that probable cause assessment? Where is, if I can trouble you with this, a record site, that would be helpful, because I didn't see that. I may have just missed it, but can you tell me where the district court calculated that overall error rate? There's not an overall error rate. There's error rates as it pertains to the different categories of U.S. citizens and for immigration status. So it's important to understand that to assess probable cause removability, it's a two-tiered assessment. First, can you obtain probable cause if a person is not a U.S. citizen? And if you can answer that question, then you move to the second tier. What is their immigration status? Do you have probable cause to believe that they're removable? And on both of those tiers, he makes the assessment. What are the databases that can show you information that you need to assess citizenship? And really what it comes down to is essentially for citizenship, three databases, the CIS database, the Claims 3, and the Claims 4 databases. The rest of the databases are irrelevant to that question. And then when you move to immigration status, you add the ADIS database, which adds the visa overstay. Those are the core databases that you need to make that assessment about citizenship and immigration status. The rest were either duplicative or were wholly irrelevant to the class because they contained information about people with removal orders or who were in ongoing proceedings which are excluded from the class. They're so limited that they don't help compensate for the errors that are in those core databases. So that's why you see those particular databases described in such detail. And in answer to the last question, though, did the district court make a specific calculation about the percentage of error on any of these particular databases you referred to? One had three databases, another had like 18. Did the district court analyze that? And if so, where is that in the record? The district court analyzed the different categories that I described. And for citizenship, it points to the fact that, for example, the database relies on more capitalization information and deletes information after 15 years. It points out that acquired and derivative citizens are nowhere in the database, so that reliance on these databases misclassifies people as lawful permanent residents or as non-citizens. And then it looks at the various other categories and points to different error rates. So it's the combination of these incompletions and these error rates, the totality of which make it completely unreasonable. I want to footnote the fact that we're talking about millions of people, particularly U.S. citizens, millions of U.S. citizens, who are just completely excluded from this database system. And it will appear, when ICE relies on them, to be removable. 44% of the foreign board population in the United States are naturalized citizens. All of them appear removable before 2005. So this is exactly the sort of situation that the Supreme Court and numerous other courts have talked about, and that it's unreasonable for officers to rely on a database that is so materially incomplete that the reliance on those, the absence of information, can't give you reliable information. And I think that points to your point. I was going to say, counsel, finish your point, then I had a follow-up question, please. I think the important cases here from the Supreme Court are Arizona v. Evans and United States v. Herring. But then on this completion issue, this court's decision in Oaxaca, the 10th Circuit's decision in Esquivel-Rios and Smith v. Oklahoma City, and the First Circuit's decision in Morales v. Chadhorn, which that decision in particular described the CIS database that's at the core of this system that ICE relies on. And I take it if we analogize the database situation to a car, this is just so I can understand your argument. You're saying that, look, even if the database wheels are really good, and even if the database mirrors are really good, and even if the database sunroof is really good, if the database engine is bad, if that database doesn't work, you can't simply strip out the engine and expect the car to still operate. You still have to, even if some databases are great, if some are bad, then the whole system is bad, and you can't simply excise the bad ones and expect the system still to work. Right, and that's exactly, Your Honor, and that's why when ICE agents are looking only at the databases and no other corroborating information, we proved at trial that it was impossible for them to know whether the information they were seeing was complete or accurate, because there's nothing to compare it to. There's no other reliable source. And I think here it's also important to note part of what the district court is saying is there are other sources of reliable information that are right at ICE's fingertips. They can check the A-files, which are available digitally. They can conduct interviews very easily that weren't practiced before the trial. And so it doesn't, for the Fourth Amendment purposes, it doesn't make any sense that they wouldn't simply check these other systems that can Are the A-files among the databases that are consulted in this particular exercise? No, they're not, Your Honor. Why is that? There wasn't evidence presented about why it was, except that there was substantial evidence that it was readily available to the ICE agents. Can you remind me when ICE switched to this system? The reason I ask is that when I was a federal prosecutor, ICE agents would make calls. They would literally call the facility and say, can you please hold this person? I don't remember it being the center in Orange County sending out these emails or however they do it. When was the switch made? Well, the program that automated the arrest was in 2008, but it was green-lighted in different places in the country at different times. The center in Laguna Niguel, I think it's been there probably since around 2010. I don't have that. Because I'm remembering the old system. I will confess, I was not familiar with the new system. I was familiar with the old system where literally the guy would get on the phone, he would review the A-file and call up the prison and say, hey, do you have Hector Ramirez there? Yes. Could you hold him for 48 hours? We think there's a warrant for his deportation or something like that. Right. And that's important to also flag is that the other system still exists. You still have ICE agents in the jails around the country who can look at the A-file, who can talk to the A-file. The ICE agents at this park in Laguna Niguel can access the A-files electronically. They can also pick up the phone and do interviews with people that are in custody. But does it make any difference that California, for example, under USA versus California, where local officers are not entitled, indeed may not cooperate with ICE officials, does that make any difference in this case, this point? No, it doesn't. That was 2019, I think, when that became effective. Well, I think particularly to the government's argument about seizure, it's irrelevant because Plaintiff Gonzalez was subject to a detainer. His seizure was imminent. And we know that because the Los Angeles Sheriff's Department's policy at that time was to honor every single detainer. But no, Your Honor, I don't think that it matters for the purposes of this option, which is against ICE at requesting this, requesting the detention, whether or not the... And there's no evidence in the record about how many states or localities honor detainers. Okay. Do you want to save time for your colleague? Okay, this is Jessica, right? Yes, Your Honor, it's Jessica Bansal. May it please the Court. To start with the neutral review claim with the Court's permission, the Supreme Court has held repeatedly that neutral review is essential if the Fourth Amendment is to provide meaningful protection against unfounded interference with liberty. So that's in Gerstein. But the Court has said the same thing again and again in both criminal and civil cases. The District Court here, in a decision on a motion for partial summary judgment, upheld a system that jettisons neutral review of ICE detainer arrests entirely. The District Court held that any ICE agent, no matter how directly involved in the day-to-day of investigations and enforcement, can review an arrest. And I want to be clear what plaintiffs are asking this Court to do on this claim. We're asking that this Court reverse that holding that any ICE agent can provide a constitutionally sufficient probable cause determination and to remand for further proceedings about what the appropriate remedy should be. What ICE is asking here is to be exempt from this basic requirement that applies to all kinds of arrests again. And it's provided no reason. It sidestepped the issue. It focuses on whether an executive officer can make a neutral determination of probable cause in the immigration context. But that's not in dispute. We agree an executive officer can. But that person has to be neutral. And the evidence here showed that it is literally the ICE officer sitting in the cubicle next to you whose job is to investigate, apprehend, remove non-citizens, who provides the review. So that's in the excerpts of record at FER 40 to 42 describing the review process. And plaintiffs have also submitted a request for judicial notice in the docket at ECF 73 that is a job description of the supervisory ICE officer who reviews these detainer arrests. And it says that their job is to apprehend, remove, and prosecute removals. The Supreme Court in Coolidge, Mancusi, Shadwick has said again and again, it is essential that you have someone who is detached from law enforcement review an arrest. ICE's only response, other than sidestepping the issue, is to say that immigration is just different. But they point to not one single case. And in fact, the Supreme Court in Brignoni-Ponce says the Fourth Amendment cannot apply differently in the immigration context because it protects U.S. citizens and non-citizens alike. So Congress's power over immigration, the Court says there, can't diminish the rights of a United States citizen who might be mistaken for a non-citizen. Hey, careful. Can I actually run a couple scenarios by you so I can understand your point? Scenario number one is what I'll say, talk about the system I used to work in, where an ICE agent would review the file, call up a prison, call up, you know, some prison in Hector Ramirez is there, I want you to hold them for 48 hours. And they hold them for 48 hours, not more than 48, I'm going to say 48 hours or less. Under what you're asking the court to do, would they have to have a judge review that decision to hold them for less than 48 hours? I think that the district court didn't get there, Your Honor, because they just decided that any ICE officer at any time. And so what the undisputed facts here are that a person can be detained for weeks without seeing an immigration judge. No, I understand that. That's my second question. But for the first question, 48 hours or less, under your view of Gerstein, are you asking us to hold that a judge must basically review the phone call that the officer makes to the prison? No, we think that the 48 hours is the sensible place to draw the line in this context as well. And so it would be after 48 hours that a neutral review of probable cause would be required to keep the person detained. So let me ask you this. Under scenario number two, if I'm at Donovan Prison, I received a phone call from the ICE agent, hold Hector Ramirez for 48 hours. If I don't receive something from ICE showing that a judge has signed off on this after 48 hours, I would have to cut him loose. That is correct, Your Honor. I just want to make sure I understand what the line is. So we would use the 48-hour rule, but the obligation would be on the federal government. At the 48-hour mark, you've got to show us something. And if you don't show us something, meaning some sort of independent determination, then the hold is effectively over and the prison would need to discharge him or do something with the person. That's right. And I apologize. I should be clear that I think that the district court didn't make a determination about what's the reasonable time period before the probable cause. And so I think that if the court agrees that it's not OK for some ICE officer to decide probable cause on day five or six or seven or eight, the proper thing is to remand to say, no, you need neutral review. And the district court could consider in the first instance, all the questions about how that would work or what the remedy would look like. Because my concern with your position, I mean, I think your position in some respects makes a lot of sense, at least the way I just portrayed it. But my concern is that the executive branch does all kinds of things. The IRS issues levies. They do all kinds of things that don't they don't go to a court to have find that there's probable cause to levy the counter. So I'm just trying to make sure I understand how far reaching you're asking us to go on this. If it's if it's one thing to say you can hold for 48 hours and if there's no finding after 40, you've got to cut them loose. That's one thing. It's another thing to say. I gave you version one that they couldn't even make the phone call. So that's why I'm trying to make sure I understand your position. No, it's the second your honor. It's at a certain point, as they say, the reasons for doing away with this neutral determination just dissipate and you have to get one if you're going to continue someone in detention. I see I have only a minute and a half left, so I'd like to save that for rebuttal. Normally, you wouldn't get a rebuttal, but if you want to save that and come after, I wasn't sure what the cross appeal. So if you have never mind, let's let's figure that you do have that. And so let's hear then from the government again has a little time and then you can have that for a rebuttal time. All right. Let's go back to Mr. Ruveni, right? Well, I lost Ruveni, but that's good. Sorry, I just had to unmute it. So thank you. Just a couple very quick points, starting first with the last points that my plaintiff's counsel was discussing. So I think three quick points on the ABLE says what ABLE says, and that is that a single ICE officer, then under the regulations, a district director can make a probable cause determination and that there's no requirement for judicial or other review at all. And district court plaintiffs were talking about judicial review. I think on appeal, they said they want either a judge or an immigration judge. They're not saying it has to be an article three judge. But ABLE is pretty clear that was a single district director with no review at all who issued that probable cause determination. So could it go on for could it go on for weeks then? Well, no, that's not that's not that was my second point, because I think your hypotheticals, Judge Owens, sort of highlight this. At hour 48, if ICE doesn't show up to make the arrest, the guy's got to go because the detainer is only for 48 hours. Let's assume the ICE officer shows up at hour 48, picks him up, takes him into ICE custody. That's when the statutory and regulatory framework kicks in. Under the statute and regulations, they must now within 48 hours, review the basis for the arrest and either cut them loose or put them in removal proceedings. And then once that happens, they get an immigration judge, and they can go to the Board of Immigration Appeals if they don't like what the immigration judge determines. And I think so the operative cases here are not Gerstein, they're not Coolidge, they're not these cases that apply in the criminal context. There's there are cases like ABLE and then cases applying similar reasoning. Sherman from the Ninth Circuit, for example, which applies it in the parole violator context. But the two cases I mentioned, the First Circuit in Chehada and the Seventh Circuit in RIS both say you don't have a constitutional right to something at 48 hours, you have what the statute gives you. So long as the statute provides some way for you to get freed or someone to review it, if you shouldn't be detained, that's enough. Let's really quickly about the database point. I think, Judge Bade, you hit exactly on this. There were findings as to only four specific databases. And those were essentially the databases that were the subject of the operative complaint in 2013. If you look in the record, there's no general percentage. There's nothing, no findings to all 30 databases. There are findings to a couple databases. And from there, the district court extrapolates to its conclusion. I see my time is up. So unless there are further questions, I'm happy to stop. Thank you for being aware of that. Okay. So, Ms. VanStall, you have a little time. Thank you, Your Honors. Just to first address the point about ABLE. ABLE says that an executive officer can review probable cause in the immigration context. Again, that is not at issue. In ABLE, the court took pains to point out that the INS officer at the time could not arrest on his own, that he had to apply to an independent, the court describes it as an independent officer at that time, the district director. The court didn't delve into the details of that person's position or their neutrality because the plaintiff in that case had conceded the claim. He wasn't actually challenging the validity of his arrest. But the court took pains to point out that there was an independent official in the picture. And since ABLE, all those cases that I mentioned, Coolidge, Shadwick, those were decided after ABLE, and they have clarified what anything the court said in Shadwick. It means the person has to be disengaged from law enforcement. It cannot be the person who is sitting next to you who is doing the same investigation as you. And finally, to the 48-hour point, Your Honor, when we filed this lawsuit, the regulation allowed for detention of up to five days. The regulation still allows for detention of up to five days. ICE made a voluntary change to their detainer form, the little piece of paper that they send out. But the regulation at issue still allows for up to five days of detention without any probable cause review. And then once the person is brought into ICE's physical custody, it's, again, just another ICE officer, just any other ICE officer who reviews that arrest. All right. Thank you, all of you, for your argument. We appreciate it. Your arguments have been very helpful. The case just argued is submitted, and the court stands adjourned for the day. Thank you. Court, for this session, stands adjourned.
judges: M. Smith, Owens, Bade